David G. Bray (#014346)
dbray@dickinsonwright.com
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Phone:  (602) 285-5000
Fax:  (602) 285-5100

*Attorneys for Plaintiff Spindle, Inc.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Spindle, Inc., a Nevada Corporation, | **Case No.:** |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| William Clark and Joann Clark, husband and wife; Sean Tate and Patricia La Due-Tate, husband and wife; Justin Clark, an individual; and Phasive, Inc., an Arizona Corporation, | |
| Defendants. | |

Comes now SPINDLE, INC. ("Spindle"), a Nevada Corporation, by and through its attorneys, Dickinson Wright, PLLC, in support of its Complaint against WILLIAM CLARK and JOANN CLARK, SEAN TATE and PATRICA La DUE-TATE, JUSTIN CLARK, and PHASIVE, INC. (collectively the "Defendants"), and states and avers as follows:

## NATURE OF ACTION

1.      Theft, deception, and disloyalty – William Clark, entrusted with the stewardship of a young and dynamic Arizona-based commerce solutions company, stole from it, deceived its directors and shareholders, and breached every duty recognized in law as obligations of corporate officials.  And, William Clark's minions – his son Justin and Sean Tate – participated willfully, knowingly and fully in William Clark's premeditated and unconscionable damage to Spindle.  This action arises from the Defendants' numerous violations and breaches of their

contractual, statutory, common law, and fiduciary duties to Spindle.  These three Defendants, together and separately, while feigning loyalty to Spindle, misappropriated Spindle's intellectual and personal property, improperly solicited Spindle's employees, customers, and investors, and engaged in various other wrongful acts that damaged irreparably Spindle's business and reputation.

2.      As a result of the Defendants' wrongful conduct, Spindle seeks injunctive relief and monetary damages, pursuant to Fed. R. Civ. P. 65, federal and state statutes, and common law.

## PARTIES, JURISDICTION, AND VENUE

3.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 and the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b).

4.      This Court has supplemental jurisdiction over claims arising under the laws of the State of Arizona pursuant to 28 U.S.C. § 1367.

5.      Venue in this district is proper under 28 U.S.C. § 1391, as each of the defendants are located in this jurisdiction and a substantial part of the events or omissions giving rise to the claims occurred in this district.

6.      Spindle is a Nevada corporation with its principal place of business in Scottsdale, Arizona.  Spindle is an innovator of unified commerce solutions for consumer-facing merchants of all sizes.  Spindle is focused on pioneering new ways for businesses to rapidly integrate business services, payment acceptance, and mobile marketing services.  Spindle also empowers location-based merchant discovery, fulfillment, and frictionless consumer engagement.  Spindle is dedicated to offering solutions that allow clients, partners, merchants, and consumers to take full advantage of the rapidly emerging mobile economy.   Spindle's extensive proprietary intellectual property portfolio includes networks, mobile payments, mobile coupon payment systems, and security.

7.      William Clark ("W. Clark") is an individual residing in Arizona.  Beginning on or about February 1, 2011, and continuing through in or about June 2016, W. Clark was Spindle's Chief Executive Officer ("CEO").

8.      Joann Clark is defendant W. Clark's spouse.  She is named only for the purposes of complying with Arizona's community property law.

9.      Upon information and belief, W. Clark acted on behalf of the Clarks' marital community with respect to the allegations contained in the Complaint.

10.     Justin Clark ("J. Clark") is an individual residing in Arizona.  J. Clark is W. Clark's son.  Beginning on or about March 25, 2013, and continuing through in or about June 2016, J. Clark was Spindle's Vice President of Infrastructure, which included managing Spindle's information technology.

11.     Sean Tate ("Tate") is an individual residing in Arizona.  Beginning on or about March 26, 2013, and continuing through in or about June 2016, Tate was Spindle's lead software developer.

12.     Patricia La Due-Tate is defendant Tate's spouse.  She is named only for the purposes of complying with Arizona community property law

13.     Upon information and belief, Tate acted on behalf of the Tates' marital community with respect to the allegations contained in the Complaint.

14.     Phasive, Inc. ("Phasive") is an Arizona Corporation with its principal place of business in Scottsdale, Arizona.  Upon information and belief, at or around the time Spindle terminated the employment of W. Clark, J. Clark, and Tate in June 2016, W. Clark, with the corrupt assistance of J. Clark and Tate, created Phasive and began engaging in business under that name.  Upon information and belief, Phasive's business unabashedly and improperly replicates entirely Spindle's business, including using Spindle's proprietary computer code in support of Phasive's mobile coupon payment system.

## FACTUAL ALLEGATIONS

## WILLIAM CLARK'S EMPLOYMENT CONTRACT WITH SPINDLE

15.     On about February 1, 2011, Spindle hired W. Clark as Spindle's CEO.

16.     On about February 1, 2011, Spindle (through its predecessor-in-interest RhinoPay, Inc.) and W. Clark entered into a contract defining their employment relationship. **Exhibit 1**, Executive Employment Agreement.  Specifically, W. Clark's Executive Employment Agreement with Spindle required W. Clark to serve Spindle "faithfully, loyally, honestly, and to the best of [W. Clark's] ability.  [W. Clark] will devote all of [W. Clark's] business time to the performance of [W. Clark's] duties for, and in the business and affairs of, [Spindle]." *Id.*, ¶ 1(b) & ¶¶ 4(a)(iii)(F), 7(b).

17.     Pursuant to the Executive Employment Agreement, W. Clark promised and agreed that Spindle owned all right, title, and interest in any proprietary software, inventions, and other intellectual property "made or conceived or reduced to practice, in whole or in part, by [Spindle] or [W. Clark] prior to and during the Term of this Agreement in connection with or relating to [Spindle's] business . . . and [W. Clark] will promptly disclose and provide all Inventions to [Spindle]. *Id.*, ¶ 6(a).

18.     W. Clark agreed to "hold in confidence and not disclose or . . . use any Proprietary Information.  Upon termination and as otherwise requested by [Spindle], [W. Clark] will promptly return to the Company all items and copies containing or embodying Proprietary Information . . . ." *Id.*, ¶ 6(b).

19.     W. Clark also agreed not to compete against Spindle for one year after the termination of W. Clark's employment agreement with Spindle, including by agreeing not to solicit, or cause others to solicit, Spindle's customers, suppliers, and employees. *Id.*, ¶ 7(c). W. Clark also agreed not to engage or cause others to engage in the same or similar business as Spindle for one year after the termination of W. Clark's employment. *Id.*, ¶ 7(d).

20.     Pursuant to the Executive Employment Agreement ¶ 4(a)(iii), Spindle had the contractual right to terminate W. Clark for cause for, among other reasons:

a.     A willful failure to perform in any material respect W. Clark's duties;

b.      An intentional act of fraud, embezzlement, theft or a dishonest act against Spindle or its affiliates;

c.      A material breach by W. Clark of the terms and provisions of the Agreement or the Employee Proprietary Information and Inventions Agreement; or

d.      A violation by W. Clark of a fiduciary duty or duty of loyalty to the Company.

21.     W. Clark agreed in the Employment Agreement that any breach of the confidentiality, non-disclosure, or non-compete clauses "will cause immediate and irreparable injury and damage to [Spindle] and that, upon a breach . . . [Spindle] cannot be made whole or have its interests completely protected solely by a monetary award of damages." *Id.*, ¶ 8(a). W. Clark further agreed that any breach of these clauses would grant Spindle the right to a "temporary and/or permanent injunction by any court of competent jurisdiction without the posting of any bond enjoining him from such unauthorized disclosure." *Id.*, ¶ 8(a).

22.     W. Clark further agreed that Spindle had the right to set-off any amounts owed to W. Clark and terminate any stock options granted to W. Clark as a result of any breach by W. Clark of the confidentiality, non-disclosure, or non-compete clauses. *Id.*, ¶¶ 8(b) & 8(c).

23.     W. Clark further agreed that Spindle would be "entitled to recover the actual attorney's fees, costs and expenses by [Spindle] in connection" with any breach by W. Clark of the confidentiality, non-disclosure, or covenant-not-to-compete clauses. *Id.*, ¶ 8(e).

**SEAN TATE'S EMPLOYMENT CONTRACT WITH SPINDLE**

24.     On or about October 10, 2012, Spindle hired Tate as Spindle's lead software developer.

25.     Tate agreed that any inventions, discoveries, or trade secrets made or found by him in the scope of his employment constituted Spindle's property. **Exhibit 2**, Tate Confidentiality, Noncompete, Nonsolicit, and Assignment Agreement, ¶ 4.

26.     Tate further agreed that all confidential information, including Spindle's software, inventions, and other intellectual property, "exclusively belongs to [Spindle] and not to [Tate]." *Id.*, ¶ 1(b).

27.     Tate further agreed that during and after his term of employment, Tate would not disclose, or use or otherwise exploit, any of Spindle's confidential information. *Id.*, ¶ 1(b).  And, Tate agreed to deliver to Spindle at any time during the term of employment, or thereafter, all confidential information which Tate may possess or control. *Id.*

28.     Tate further agreed that during his employment, and for one year after the termination of his employment, Tate would not: (a) perform any work or services that compete with Spindle; or (b) solicit Spindle's employees or customers. *Id.*, ¶¶ 2(b), 3(a), and 3(b).

29.     Tate further agreed that his performance was "vital and unique to [Spindle], and that any breach or default would give rise to significant and irreparable injury to [Spindle] for which money damages are an inadequate remedy." *Id.*, ¶ 5.

30.     Tate further agreed that he was "responsible for all damages incurred by [Spindle] in connection with such breach or default, including the reasonable fees of [Spindle's] attorneys and their support staff." *Id.*

31.     Tate further agreed that because of his employment with Spindle he had "access to sensitive data maintained by Spindle." **Exhibit 3**, Tate Confidentiality Agreement.

32.     Tate further agreed that he would "obtain, use or disclose such data only in connection with the performance of [his] official duties solely for authorized purposes." *Id.*

33.     Tate further agreed "to maintain the confidentiality of Information in accordance with the Spindle Inc. Regulations" and that he understood "that failure to safeguard Sensitive data may result in the imposition of penalties, including fines, costs of prosecution, dismissal from office, discharge from employment, and imprisonment." *Id.*

34.     Tate further agreed that if he observed any "conditions, which could cause said information to be compromised in any way, [Tate] understands that it is [Tate's] responsibility to take action to safeguard Spindle Inc. data and report the incident to [Tate's] manager." *Id.*

35.     Tate further agreed that his "obligation to safeguard the confidentiality of Spindle Inc. data shall survive the termination of my employment with Spindle Inc." *Id.*

**JUSTIN CLARK'S CONFIDENTIALITY AGREEMENT WITH SPINDLE**

36.     On or about February 1, 2011, Spindle hired J. Clark as Spindle's Vice President of Infrastructure.

37.     From in or about February 2011 to in or about June 2016, J. Clark was employed as Spindle's Vice President of Infrastructure.

38.     J. Clark agreed that he had access to sensitive data maintained by Spindle. **Exhibit 4**, J. Clark Confidentiality Agreement.

39.     J. Clark further agreed that he would "obtain, use or disclose such data only in connection with the performance of [J. Clark's] official duties solely for authorized purposes." *Id.*

40.     J. Clark further agreed "to maintain the confidentiality of information in accordance with the Spindle Inc. Regulations." *Id.*

41.     J. Clark further agreed that if he observed any "conditions, which could cause said information to be compromised in any way, [J. Clark] understand that it is [J. Clark's] responsibility to take action to safeguard Spindle Inc. data and report the incident to [J. Clark's] manager." *Id.*

42.     J. Clark further agreed "to maintain the confidentiality of Information in accordance with the Spindle Inc. Regulations" and that he understood "that failure to safeguard Sensitive data may result in the imposition of penalties, including fines, costs of prosecution, dismissal from office, discharge from employment, and imprisonment." *Id.*

43.     J. Clark further agreed that his "obligation to safeguard the confidentiality of Spindle Inc. data shall survive the termination of my employment with Spindle Inc." *Id.*

**SPINDLE DEVELOPED YOWZA!! BASED ON TRADE SECRETS**

44.     In January 2014, Spindle acquired a mobile application called Yowza!!.  Yowza!! is a next-generation mobile marketing solution that delivers free real-time coupons and offers to consumers through their iOS and Android devices.  W. Clark was the main driver for the acquisition and Spindle thereafter entrusted to him responsibility for incorporating the Yowza!! application for the benefit of Spindle and Spindle's shareholders.

45.     Yowza!! is a mobile savings application which allows users to discover relevant local businesses, as well as identify, save, and retrieve coupons for local businesses.  Such an application is consistent with Spindle's business and focus.

46.     Spindle spent substantial time and money ($500,000 and 1.6 million shares purchased alone) developing software that enabled Yowza!! to be integrated with Me Network, another couponing software that Spindle had acquired.  W. Clark was responsible for the Me Network acquisition as well.

47.     W. Clark tasked defendants Tate and J. Clark, while all three were employees of Spindle, with developing the secret and proprietary software code that operates Yowza!!, and Defendants Tate and J. Clark developed the software code for Spindle.

48.     Spindle invested substantial time and money developing and launching Yowza!! in its current form.

49.     Spindle took substantial actions to maintain the secrecy of the Yowza!! software code, including requiring every employee with knowledge of, or access to, the code to execute a non-disclosure agreement prohibiting the disclosure of the software code, as well as protecting the code with electronic security measures.

50.     The vast majority of the commercial value of Yowza!! is derived from the relevant software code remaining secret, as disclosure of that code would allow virtually anyone to launch an application that competes directly with Yowza!! and Spindle.

51.     W. Clark, J. Clark, and Tate each had actual knowledge that Yowza!!'s software code was considered a trade secret, and that the same was also covered by their contracts with Spindle, including their confidentiality, non-disclosure, and non-compete agreements.

52.     W. Clark, J. Clark, and Tate each had actual knowledge and specifically agreed and understood that Yowza!! and everything related to it, including the software code, was the exclusive property of Spindle.

53.     J. Clark and Tate had full access to and knew the relevant software code that operated Yowza!!

## WILLIAM CLARK FAILED TO PERFORM
## HIS DUTIES AS CEO AND LIED TO INVESTORS

54.    During 2015 and 2016, Spindle's Board of Directors determined that W. Clark was failing to perform satisfactorily his duties as Spindle's CEO.

55.    At W. Clark's direction, Spindle invested substantial time and money in the Yowza!! application.  Despite these efforts, Yowza!! failed to become fully functional, and W. Clark knew fully, or was grossly negligent in not knowing, the status of the functionality of the Yowza!! application.

56.    As CEO, W. Clark directed and supervised J. Clark and Tate in the development of the Yowza!! code.  At all times, W. Clark had an absolute duty to preserve and protect Yowza!! and the Yowza!! code as an asset of Spindle.

57.    At W. Clark's direction, Spindle invested substantial time and money in a payment services platform, which never became fully functional.

58.    Subsequently, Defendant Tate, at all times a Spindle employee, developed payments services software to enable merchants to move to Spindle's platforms (commonly referred to in the industry as "boarded").

59.    At all times during his tenure as CEO of Spindle, W. Clark knew fully or was grossly negligent in not knowing the financial position of Spindle.  W. Clark represented affirmatively to the Board of Directors and to investors that Spindle would begin to generate revenue by January 2016.  In fact, W. Clark knew otherwise.  By lying to or omitting to disclose material facts to the Board of Directors and shareholders, W. Clark damaged Spindle's credibility with investors and shareholders.  In fact, W. Clark knew or should have known that Spindle would not generate revenue by January 2016.

60.    W. Clark made materially false and misleading statements to the Board of Directors and to Spindle's shareholders and investors when W. Clark represented that Yowza!! had approximately two million (2,000,000) users.  Specifically, W. Clark created confusion by indicating that the original amount of Yowza!! downloads (*i.e.*, 2,000,000) was indicative of use.

In truth and in fact, Yowza!! had at the time of acquisition less than five thousand (5,000) active users.

61.   In August 2015, Spindle acquired Catalyst Business Development Inc. ("Catalyst"), a Scottsdale, Arizona-based provider of payment gateway services, sales and software solutions.  Catalyst brought with it a sales pipeline of opportunities and relationships and an ability to process business not previously held by Spindle.  W. Clark was charged with developing technical aspects of Catalyst's technology, given W. Clark's articulated belief that Catalyst would be accretive to Spindle.  W. Clark was adamant to the Board of Directors that the acquisition of Catalyst Gateway would generate revenue from Catalyst's current customers and prospective customers.   However, during 2015 and 2016, W. Clark negligently failed to complete technical projects related to Catalyst, preventing Spindle from realizing the near certain revenues that the Catalyst Gateway transaction should have generated.

62.   During 2015 and 2016, W. Clark misrepresented to the Board of Directors and shareholders of Spindle the nature and quality of Catalyst's referral contracts.

63.   In May 2016, W. Clark misrepresented to Spindle shareholders that Spindle would generate more than $122,000 per month in revenue in the coming months.  These representations to shareholders were consistent with the projections, now known to be false, that W. Clark provided to the Board of Directors.  When W. Clark was making the projections to shareholders, W. Clark knew or was grossly negligent in not knowing that the projections were inaccurate.   In truth and in fact, Spindle would generate far less, such that W. Clark's representations constituted materially false and misleading statements to shareholders.

64.   In 2016, W. Clark misrepresented to Spindle's Board of Directors and to Spindle shareholders that many of the merchants being boarded would become recurring clients to Spindle.   Specifically, W. Clark omitted to state that due to the high risk profile of certain customers, pricing sensitivity, and a lack of ability to properly service customers, there could be severe revenue fluctuation and a possible loss of the associated revenue in its entirety. Accordingly, W. Clark knew that his statements to the Board of Directors and to Spindle's shareholders were materially false and misleading when W. Clark made the statements, or W.

Clark was grossly negligent in not knowing that his statements about the potential for recurring use were materially false and misleading.

65.     During 2016, Spindle sought to obtain a client located in Canada, C&H Pharma Group ("C&H Pharma"). Had Spindle been able to board the pharmacies from the C&H Pharma portfolio, this would have generated revenue for Spindle roughly between $100,000 and $150,000 per month at a healthy profit margin. However, W. Clark failed to apprise himself of the pertinent laws and regulations in Canada, causing the transaction with C&H Pharma to stall indefinitely without coming to fruition. Whether as a result of W. Clark's incompetence or intentional dereliction of his duties, W. Clark caused direct harm to Spindle by failing to pursue prudently the transaction with C&H Pharma.

66.     In 2016, W. Clark also misrepresented to the Board of Directors and shareholders of Spindle the number and quality of merchants being boarded onto Yowza!!

67.     W. Clark also misrepresented to the Board of Directors and shareholders the number and quality of additional sales opportunities available to Spindle in 2016. Specifically, on or about May 17, 2016, W. Clark stated in a letter to shareholders that "revenue will continue to scale higher going forward over the balance of the year. We currently have a robust pipeline of opportunity, including many merchants currently being boarded and numerous additional sales opportunities in varying stages of discussion." W. Clark also presented a document "2016 Project Launches" to the Board on January 21, 2016 which document projected 2016 revenue at over $9 million when W. Clark knew or should have known based on present existing facts that it would be impossible for Spindle to even come close to that revenue number.

68.     Because of W. Clark's consistent practice of creating unreasonable expectations for shareholders and then failing to meet such expectations, W. Clark as CEO of Spindle lost credibility with Spindle's shareholders and caused the material dilution of Spindle's stock, resulting in the number of Spindle shares going from approximately 17,000,000 to 68,000,000 during his tenure as CEO.

69.     Upon information and belief, in May 2016, W. Clark purposefully manipulated Spindle's stock price by encouraging a third-party to sell his stock, thereby depressing the price

of Spindle stock. After W. Clark manipulated Spindle's stock price to a record low of 13.5 cents per share, W. Clark converted debt owed to him into shares of Spindle stock at the artificially depressed price.

## WILLIAM CLARK'S TERMINATION AND TRANSITION AGREEMENT

70.     Because of W. Clark's grave breaches of his fiduciary duties as CEO, in or about May 2016, Spindle's Board of Directors determined that the best interests of Spindle and its shareholders necessitated terminating W. Clark's employment.

71.     Despite W. Clark's gross misconduct, when W. Clark learned that he would be terminated as Spindle's CEO, W. Clark threw what could best be described as a childish "hissy fit" and began threatening Spindle. Instead of recognizing his breaches of duties and violations of securities laws, W. Clark set out to exact revenge against the company and its shareholders.

72.     Significantly, despite knowing full well that doing so violated his Executive Employment Agreement, W. Clark unabashedly stated that he planned to start his own version of Yowza!! when he left Spindle. W. Clark was indifferent to the consequences.

73.     W. Clark also demanded that he receive 1 million shares of Spindle stock or else he would immediately abandon his duties at Spindle without providing Spindle information necessary for the day-to-day operation of Spindle such as login credentials and passwords for electronic accounts and access to Spindle's bank account. Fearing the irreparable harm that W. Clark would cause to Spindle and its shareholders, and facing an extortionate demand, Spindle felt as if it had no choice but to accede reluctantly to W. Clark's threat as a way of protecting the company and its shareholders.

74.     In order to avoid a disruption of its business operations, Spindle offered W. Clark certain consideration in exchange for his agreement to facilitate an orderly transition of leadership at Spindle.

75.     On or about June 10, 2016, W. Clark sent a letter to Spindle, resigning his position effective that day.

76.     On or about June 13, 2016, Spindle and W. Clark entered into a Transition Agreement, which defined the parties' responsibilities during the wind-down of W. Clark's

employment with Spindle. **Exhibit 5**, W. Clark Transition Agreement.  W. Clark signed the W. Clark Transition Agreement.

77.     The Transition Agreement prohibited W. Clark from revealing, disclosing, selling, or using any of Spindle's confidential information, including but not limited to Spindle's proprietary software, inventions, and other intellectual property. *Id.*, ¶ 3(a)(i) and (ii).

78.     Pursuant to the Transition Agreement, W. Clark agreed that "[W. Clark] acknowledges that Executive's development, work or research on any and all inventions or expressions of ideas . . . . provided such invention or expression of an idea relates to the business of the Company, or relates to actual or demonstrably anticipated research or development of the Company, or results from any work performed by Executive for or on behalf of the Company, are hereby licensed to the Company by an irrevocable fully paid worldwide license." *Id.*, §2.

79.     Pursuant to the Transition Agreement, W. Clark agreed that he would "not, during the Transition Period and for a period of sixty (60) days thereafter . . . disclose, sell, use, lecture upon or publish any "Confidential Information." *Id.*, § 3(a)(i).

80.     Pursuant to the Transition Agreement, W. Clark agreed that "[a]ll documents and other property that relate to the business of [Spindle] are the exclusive property of [Spindle], even if [W. Clark] authored or created them.  W. Clark agrees to return all such documents that [W. Clark] knowingly has and tangible property to [Spindle] upon termination of employment . . . ." *Id.*, § 3(a)(iii).

81.     Pursuant to the Transition Agreement, W. Clark promised that "Executive will not take any actions that would reasonably be expected to be detrimental to the interests of the Company, nor make derogatory statements, either written or oral to any third party, or otherwise publicly disparage the Company, its products, services, or present or former employees, officers or directors, and will not authorize others to make derogatory or disparaging statements on Executive's behalf." *Id.*, § 3(b).

82.     Pursuant to the Transition Agreement, W. Clark was to receive 1,000,000 shares of Spindle's restricted common stock in exchange for transferring all information and property to a person of Spindle's Board of Directors' choosing. *Id.*, § 1(b)(i).  500,000 of these shares were

to be transferred to W. Clark upon his execution of the Transition Agreement, and 500,000 of these shares were to be transferred to W. Clark sixty (60) days after the execution of the Transition Agreement upon the condition that W. Clark successfully performed his duties under the transition agreement. *Id.*

83.     Pursuant to the Transition Agreement, W. Clark agreed that "[W. Clark] acknowledges that irreparable harm would result from any breach by [W. Clark] of the provisions of this Agreement . . . . and that monetary damages alone would not provide adequate relief for any such breach.  Accordingly, if [W. Clark] breaches this Agreement, [W. Clark] consents to injunctive relief in favor of [Spindle] without the necessity of [Spindle] posting a bond." *Id.*, § 4.

84.     Despite W. Clark negotiating the terms of his extortionate demand and accepting their memorialization in the Transition Agreement, W. Clark's signature again meant nothing. He proceeded to violate the Transition Agreement and his previously executed agreements, including his continuing fiduciary duties.

## DEFENDANTS' STEAL SPINDLE'S BUSINESS AND INTELLECTUAL PROPERTY

85.     Only days after executing the Transition Agreement, on or about June 24, 2016, W. Clark and J. Clark incorporated Defendant Phasive, Inc. in Arizona.  Upon information and belief, W. Clark and J. Clark's purpose in creating and incorporating Phasive was to compete directly with Spindle, as Phasive purports to offer virtually the same services as Spindle.

86.     During June 2016, while still working at Spindle, W. Clark and J. Clark discussed starting their own company.

87.     Beginning in or about June 2016, and continuing through at least July 2016, W. Clark attempted to damage Spindle's business and reputation by making false statements about Spindle.  While still employed at Spindle, W. Clark and J. Clark told Spindle employees that Spindle's new direction was terrible, that Spindle would go bankrupt after they left, and that the remaining Spindle employees would lose their jobs.

88.     Beginning in or about June 2016, and continuing through at least July 2016, W. Clark attempted to solicit Spindle's employees, customers, and investors for the benefit of Phasive.  Such solicitation occurred while W. Clark was still employed by Spindle.

89.     Defendants Tate and J. Clark were key employees at Spindle and were crucial to Spindle's intellectual property development.   Therefore, Spindle attempted to retain them as employees.  However W. Clark, while still employed by Spindle, persuaded Tate and J. Clark to leave Spindle and join Phasive.

90.     During June 2016, W. Clark, J. Clark, and Tate, while still employed by Spindle, engaged in conversations with an investor believed to be 3G Capital attempting to solicit investors for the benefit of Phasive during a call that took place in one of Spindle's conference rooms.

91.     Shortly after the improper call to the foreign investor, Spindle terminated W. Clark, J. Clark, and Tate, who were escorted out of Spindle's office building.

92.     As W. Clark, J. Clark, and Tate were being escorted out of Spindle's offices, a Spindle representative asked them to return any Spindle information that they retained on their laptop computers.  They refused.

93.     Spindle subsequently discovered that J. Clark removed his desktop computer from Spindle's office.  This computer contained all of Spindle's proprietary information and trade secrets related to Yowza!! and Spindle's payment processing software, as well as yet-to-be-determined proprietary information, trade secrets, and other intellectual property.  This desktop computer has not been returned to Spindle.

94.     Prior to his departure, J. Clark also looted a television monitor belonging to Spindle from Spindle's offices, which has not been returned.

95.     W. Clark, J. Clark, and Tate also took all of Spindle's access codes, customer lists, software codes, presentations, and confidential e-mail communications with attorneys and accountants.

96.     W. Clark, J. Clark, and Tate also "wiped" all data off of their company computers prior to their termination from Spindle.  Upon information and belief, Defendants wiped the data

off their company computers to conceal the fact that they had been using Spindle's time, resources, and information to develop Phasive, as well as to intentionally disrupt Spindle's business operations.

97.    Within days of their termination, W. Clark, J. Clark, and Tate made public disclosure of their intent to launch the mobile application Phasive, which performs most of the same functions as Spindle's Yowza!!

98.    Upon information and belief, Defendants used Spindle's time, resources, proprietary information, trade secrets, and intellectual property to develop Phasive while still employed at Spindle.

99.    Defendants caused at least one major Spindle client, Virus Eraser, to substantially reduce its transactions with Spindle.

100.    Upon information and belief, Defendants are actively soliciting Spindle's clients and investors using proprietary information and trade secrets they obtained from Spindle.

101.    In or about June 2016, W. Clark caused an unauthorized transfer of 500,000 shares of Spindle's restricted common stock to himself.

### FIRST CLAIM FOR RELIEF

### (Breach of Contract – Against W. Clark)

102.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

103.    Spindle and W. Clark entered into a valid and existing contract.

104.    Spindle performed or was excused from performance.

105.    W. Clark breached the contract.

106.    As a result of W. Clark's contract breaches, Spindle sustained damages in an amount to be ascertained at trial.

### SECOND CLAIM FOR RELIEF

### (Breach of Contract – Against J. Clark)

107.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

1   108.   Spindle and J. Clark entered into a valid and existing contract.

2   109.   Spindle performed or was excused from performance.

3   110.   J. Clark breached the contract.

4   111.   As a result of J. Clark's contract breaches, Spindle has sustained damages in an

5   amount to be ascertained at trial.

6   **THIRD CLAIM FOR RELIEF**

7   **(Breach of Contract – Against Tate)**

8   112.   Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as

9   if fully set forth herein.

10   113.   Spindle and Tate entered into a valid and existing contract.

11   114.   Spindle performed or was excused from performance.

12   115.   Tate breached the contract.

13   116.   As a result of Tate's breaches, Spindle has sustained damages in an amount to be

14   ascertained at trial.

15   **FOURTH CLAIM FOR RELIEF**

16   **(Breach of Fiduciary Duty – Against W. Clark)**

17   117.   Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as

18   if fully set forth herein.

19   118.   W. Clark owed a fiduciary duty to Spindle.

20   119.   W. Clark breached that duty.

21   120.   As a result of W. Clark's breaches of his fiduciary duties, Spindle has sustained

22   damages in an amount to be ascertained at trial.

23   **FIFTH CLAIM FOR RELIEF**

24   **(Breach of Fiduciary Duty – Against J. Clark)**

25   121.   Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as

26   if fully set forth herein.

27   122.   J. Clark owed a fiduciary duty to Spindle.

28   123.   J. Clark breached that duty.

124.    As a result of J. Clark's breaches of his fiduciary duties, Spindle has sustained damages in an amount to be ascertained at trial.

## SIXTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – Against Tate)

125.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

126.    Tate owed a fiduciary duty to Spindle.

127.    Tate breached that duty.

128.    As a result of Tate's breaches of his fiduciary duties, Spindle has sustained damages in an amount to be ascertained at trial.

129.    Spindle has been required to retain an attorney and to incur attorney's fees and court costs herein.

## SEVENTH CLAIM FOR RELIEF

### (Unfair Competition – Against W. Clark)

130.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

131.    Spindle invested substantial time, skill and money in developing its property, including but not limited to, its intellectual property, trade secrets, marketing strategy, business goodwill, employees, customers, and investors.

132.    W. Clark misappropriated and used Spindle's property at little or no cost.

133.    W. Clark's misappropriation and use of Spindle's property was without Spindle's authorization or consent.

134.    W. Clark's misconduct described above constitutes unfair competition under Arizona law.

135.    As a result of W. Clark's unfair competition, Spindle has sustained damages in an amount to be ascertained at trial.

**EIGHTH CLAIM FOR RELIEF**

**(Unfair Competition – Against J. Clark)**

136.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

137.    Spindle invested substantial time, skill and money in developing its property, including but not limited to its intellectual property, trade secrets, marketing strategy, business goodwill, employees, customers, and investors.

138.    J. Clark misappropriated and used Spindle's property at little or no cost.

139.    J. Clark's misappropriation and use of Spindle's property was without Spindle's authorization or consent.

140.    J. Clark's misconduct described above constitutes unfair competition under Arizona law.

141.    As a result of J. Clark's unfair competition, Spindle has sustained damages in an amount to be ascertained at trial.

**NINTH CLAIM FOR RELIEF**

**(Unfair Competition – Against Tate)**

142.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

143.    Spindle invested substantial time, skill and money in developing its property, including but not limited to its intellectual property, trade secrets, marketing strategy, business goodwill, employees, customers, and investors.

144.    Tate misappropriated and used Spindle's property at little or no cost.

145.    Tate's misappropriation and use of Spindle's property was without Spindle's authorization or consent.

146.    Tate's misconduct described above constitutes unfair competition under Arizona law.

147.    As a result of Tate's unfair competition, Spindle has sustained damages in an amount to be ascertained at trial.

## TENTH CLAIM FOR RELIEF

### (Unfair Competition – Against Phasive)

148.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

149.    Spindle invested substantial time, skill and money in developing its property, including but not limited to its intellectual property, trade secrets, marketing strategy, business goodwill, employees, customers, and investors.

150.    Phasive misappropriated and used Spindle's property at little or no cost.

151.    Phasive's misappropriation and use of Spindle's property was without Spindle's authorization or consent.

152.    Phasive's misconduct described above constitutes unfair competition under Arizona law.

153.    As a result of Phasive's unfair competition, Spindle has sustained damages in an amount to be ascertained at trial.

## ELEVENTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets under the Defend Trade Secrets Act and the Arizona Trade Secrets Act – Against W. Clark)

154.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

155.    W. Clark misappropriated Spindle's valuable trade secrets through the use and disclosure of the trade secrets.

156.    W. Clark's misappropriation of Spindle's trade secrets was wrongful because it was made in breach of an express or implied contract not to disclose.

157.    W. Clark's misappropriation of Spindle's trade secrets was wrongful because W. Clark had a duty not to disclose.

158.    Spindle's trade secrets that were misappropriated by W. Clark relate to a product or service used in, or intended for use in, interstate commerce

17.     As a result of W. Clark's misappropriation of trade secrets, Spindle has sustained damages in an amount to be ascertained at trial.

## TWELFTH CLAIM FOR RELIEF

**(Misappropriation of Trade Secrets under the Defend Trade Secrets Act and the Arizona Trade Secrets Act – Against J. Clark)**

159.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

160.     J. Clark misappropriated Spindle's valuable trade secrets through the use and disclosure of the trade secrets.

161.     J. Clark's misappropriation of Spindle's trade secrets was wrongful because it was made in breach of an express or implied contract not to disclose.

162.     J. Clark's misappropriation of Spindle's trade secrets was wrongful because J. Clark had a duty not to disclose.

163.     Spindle's trade secrets that were misappropriated by J. Clark relate to a product or service used in, or intended for use in, interstate commerce

164.     As a result of J. Clark's misappropriation of trade secrets, Spindle has sustained damages in an amount to be ascertained at trial.

## THIRTEENTH CLAIM FOR RELIEF

**(Misappropriation of Trade Secrets under the Defend Trade Secrets Act and the Arizona Trade Secrets Act – Against Tate)**

165.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

166.     Tate misappropriated Spindle's valuable trade secrets through the use and disclosure of the trade secrets.

167.     Tate's misappropriation of Spindle's trade secrets was wrongful because it was made in breach of an express or implied contract not to disclose.

168.     Tate's misappropriation of Spindle's trade secrets was wrongful because Tate had a duty not to disclose.

169.     Spindle's trade secrets that were misappropriated by Tate relate to a product or service used in, or intended for use in, interstate commerce

170.     As a result of Tate's misappropriation of trade secrets, Spindle has sustained damages in an amount to be ascertained at trial.

## FOURTEENTH CLAIM FOR RELIEF

**(Misappropriation of Trade Secrets under the Defend Trade Secrets Act and the Arizona Trade Secrets Act –Against Phasive)**

171.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

172.     Phasive misappropriated Spindle's valuable trade secrets through the use and disclosure of the trade secrets.

173.     Phasive's misappropriation of Spindle's trade secrets was wrongful because Phasive had a duty not to disclose and/or because Phasive knew that it acquired Spindle's trade secrets from parties (W. Clark, J. Clark and/or Tate) who had a duty not to disclose.

174.     Spindle's trade secrets that were misappropriated by Phasive relate to a product or service used in, or intended for use in, interstate commerce

175.     As a result of Phasive's misappropriation of trade secrets, Spindle has sustained damages in an amount to be ascertained at trial.

## FIFTEENTH CLAIM FOR RELIEF

**(Tortious Interference with Contractual Relations – Against W. Clark)**

176.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

177.     There exist valid contracts between Spindle and third-parties for business and commercial services.  There also exist valid contracts between Spindle and its current and former employees.

178.     W. Clark knew of these contracts.

179.     W. Clark committed intentional acts intended to disrupt these contractual relationships.

180.    Spindle's contractual relationships were disrupted.

181.    As a result of W. Clark's tortious interference with contractual relations, Spindle has sustained damages in an amount to be ascertained at trial.

## SIXTEENTH CLAIM FOR RELIEF

### (Tortious Interference with Contractual Relations – Against J. Clark)

182.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

183.    There exist valid contracts between Spindle and third-parties for business and commercial services.  There also exist valid contracts between Spindle and its current and former employees.

184.    J. Clark knew of these contracts.

185.    J. Clark committed intentional acts intended to disrupt these contractual relationships.

186.    Spindle's contractual relationships were disrupted.

187.    As a result of J. Clark's tortious interference with contractual relations, Spindle has sustained damages in an amount to be ascertained at trial.

## SEVENTEENTH CLAIM FOR RELIEF

### (Tortious Interference with Contractual Relations – Against Phasive)

188.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

189.    There exist valid contracts between Spindle and third-parties for business and commercial services.  There also exist valid contracts between Spindle and its current and former employees.

190.    Phasive knew of these contracts.

191.    Phasive committed intentional acts intended to disrupt these contractual relationships.

192.    Spindle's contractual relationships were disrupted.

193.    As a result of Phasive's tortious interference with contractual relations, Spindle has sustained damages in an amount to be ascertained at trial.

## EIGHTEENTH CLAIM FOR RELIEF

### (Tortious Interference with Contractual Relations – Against Tate)

194.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

195.    There exist valid contracts between Spindle and third-parties for business and commercial services.  There also exist valid contracts between Spindle and its current and former employees.

196.    Tate knew of these contracts.

197.    Tate committed intentional acts intended to disrupt these contractual relationships.

198.    Spindle's contractual relationships were disrupted.

199.    As a result of Tate's tortious interference with contractual relations, Spindle has sustained damages in an amount to be ascertained at trial.

## NINETEENTH CLAIM FOR RELIEF

### (Tortious Interference with Prospective Economic Advantage – Against W. Clark)

200.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

201.    There exist prospective contractual relationships between Spindle and third-parties for business and commercial services.   There also exist prospective contractual relationships between Spindle and its current and prospective investors.

202.    W. Clark knew of these prospective contractual relationships.

203.    W. Clark committed intentional acts intended to prevent these prospective contractual relationships.

204.    W. Clark's actions were neither privileged nor justified.

205.    As a result of W. Clark's tortious interference with prospective economic advantage, Spindle has sustained damages in an amount to be ascertained at trial.

**TWENTIETH CLAIM FOR RELIEF**

**(Tortious Interference with Prospective Economic Advantage – Against J. Clark)**

206.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

207.    There exist prospective contractual relationships between Spindle and third-parties for business and commercial services.    There also exist prospective contractual relationships between Spindle and its current and prospective investors.

208.    J. Clark knew of these prospective contractual relationships.

209.    J. Clark committed intentional acts intended to prevent these prospective contractual relationships.

210.    J. Clark's actions were neither privileged nor justified

211.    As a result of J. Clark's tortious interference with prospective economic advantage, Spindle has sustained damages in an amount to be ascertained at trial.

**TWENTY-FIRST CLAIM FOR RELIEF**

**(Tortious Interference with Prospective Economic Advantage – Against Tate)**

212.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

213.    There exist prospective contractual relationships between Spindle and third-parties for business and commercial services.    There also exist prospective contractual relationships between Spindle and its current and prospective investors.

214.    Tate knew of these prospective contractual relationships.

215.    Tate committed intentional acts intended to prevent these prospective contractual relationships.

216.    Tate's actions were neither privileged nor justified.

217.    As a result of Tate's tortious interference with prospective economic advantage, Spindle has sustained damages in an amount to be ascertained at trial.

## TWENTY-SECOND CLAIM FOR RELIEF

### (Tortious Interference with Prospective Economic Advantage – Against Phasive)

218.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

219.    There exist prospective contractual relationships between Spindle and third-parties for business and commercial services.    There also exist prospective contractual relationships between Spindle and its current and prospective investors.

220.    Phasive knew of these prospective contractual relationships.

221.    Phasive committed intentional acts intended to prevent these prospective contractual relationships.

222.    Phasive's actions were neither privileged nor justified.

223.    As a result of Phasive's tortious interference with prospective economic advantage, Spindle has sustained damages in an amount to be ascertained at trial.

## TWENTY-THIRD CLAIM FOR RELIEF

### (Defamation – Against W. Clark)

224.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

225.    W. Clark made false and defamatory statements concerning Spindle, including but not limited to that Spindle would go bankrupt and that Spindle employees would lose their jobs.

226.    An unprivileged publication of these statements was made to a third person.

227.    W. Clark was at least negligent in making these statements.

228.    As a result of W. Clark's defamation, Spindle has sustained damages in an amount to be ascertained at trial.

## TWENTY-FOURTH CLAIM FOR RELIEF

### (Defamation – Against J. Clark)

229.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

230.     J. Clark made false and defamatory statements concerning Spindle, including but not limited to that Spindle would go bankrupt and that Spindle employees would lose their jobs.

231.     An unprivileged publication of these statements was made to a third person.

232.     J. Clark was at least negligent in making these statements.

233.     As a result of J. Clark's defamation, Spindle has sustained damages in an amount to be ascertained at trial.

### TWENTY-FIFTH CLAIM FOR RELIEF

### (Defamation – Against Tate)

234.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

235.     Tate made false and defamatory statements concerning Spindle, including but not limited to that Spindle would go bankrupt and that Spindle employees would lose their jobs.

236.     An unprivileged publication of these statements was made to a third person.

237.     Tate was at least negligent in making these statements.

238.     As a result of Tate's defamation, Spindle has sustained damages in an amount to be ascertained at trial.

### TWENTY-SIXTH CLAIM FOR RELIEF

### (Defamation – Against Phasive)

239.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

240.     Phasive made false and defamatory statements concerning Spindle, including but not limited to that Spindle would go bankrupt and that Spindle employees would lose their jobs.

241.     An unprivileged publication of these statements was made to a third person.

242.     Phasive was at least negligent in making these statements.

243.     As a result of Phasive's defamation, Spindle has sustained damages in an amount to be ascertained at trial.

**TWENTY-SEVENTH CLAIM FOR RELIEF**

**(Conspiracy – Against All Defendants)**

244.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

245.    Defendants, by acting in concert, intended to accomplish an unlawful objective for the purpose of harming Spindle.

246.    Defendants acted together and had an agreement to misappropriate Spindle's property and undermine Spindle's relationships with its customers, investors, and employees.

247.    Defendants sought to destroy Spindle's business throughout the world.

248.    As a result, Spindle has sustained damages in an amount to be ascertained at trial.

**TWENTY-EIGHTH CLAIM FOR RELIEF**

**(Concert of Action – Against All Defendants)**

249.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

250.    Defendants acted with one another to commit a tort while acting in concert or pursuant to a common design.

251.    Defendants acted together and had an agreement to misappropriate Spindle's property and undermine Spindle's relationships with its customers, investors, and employees.

252.    Defendants sought to destroy Spindle's business throughout the world.

253.    Defendants sought to obtain Spindle's business for themselves.

254.    As a result, Spindle has sustained damages in an amount to be ascertained at trial.

**TWENTY-NINTH CLAIM FOR RELIEF**

**(Breach of Duty of Loyalty – Against W. Clark)**

255.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

256.    W. Clark was Spindle's agent.

257.    W. Clark breached his agency obligations by not acting as a fiduciary for Spindle and by engaging in acts designed to injure his agency relationship with Spindle.

258.     W. Clark failed to use reasonable efforts to give Spindle information which was relevant to the affairs entrusted to him.

259.     As a result of W. Clark's breaches of his duty of loyalty, Spindle has sustained damages in an amount to be ascertained at trial.

## THIRTIETH CLAIM FOR RELIEF

### (Breach of Duty of Loyalty – Against J. Clark)

260.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

261.     J. Clark was Spindle's agent.

262.     J. Clark breached his agency obligations by not acting as a fiduciary for Spindle and by engaging in acts designed to injure his agency relationship with Spindle.

263.     J. Clark failed to use reasonable efforts to give Spindle information which was relevant to the affairs entrusted to him.

264.     As a result of J. Clark's breaches of his duty of loyalty, Spindle has sustained damages in an amount to be ascertained at trial.

## THIRTY-FIRST CLAIM FOR RELIEF

### (Breach of Duty of Loyalty – Against Tate)

265.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

266.     Tate was Spindle's agent.

267.     Tate breached his agency obligations by not acting as a fiduciary of Spindle and by engaging in acts designed to injure his agency relationship with Spindle.

268.     Tate failed to use reasonable efforts to give Spindle information which was relevant to the affairs entrusted to him.

269.     As a result of Tate's breaches of his duty of loyalty, Spindle has sustained damages in an amount to be ascertained at trial.

**THIRTY-SECOND CLAIM FOR RELIEF**

**(Conversion – Against All Defendants)**

270.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

271.     Defendants committed a distinct act of dominion wrongfully exerted over Spindle's personal property.

272.     The act was in denial of, or inconsistent with, Spindle's title or rights therein; or the act was in derogation, exclusion or defiance of Spindle's title or rights in the personal property.

273.     As a result of Defendants' conversion, Spindle has sustained damages in an amount to be ascertained at trial.

**THIRTY-THIRD CLAIM FOR RELIEF**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing**

**– Against W. Clark)**

274.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

275.     Spindle and W. Clark were parties to a contract.

276.     W. Clark owed a duty of good faith to Spindle, as every contract in Arizona contains an implied covenant of good faith and fair dealing.

277.     W. Clark breached that duty by performing in a manner that was unfaithful to the purpose of the contract.

278.     As a result of W. Clark's breaches of the implied covenant of good faith and fair dealing, Spindle has sustained damages in an amount to be ascertained at trial.

**THIRTY-FOURTH CLAIM FOR RELIEF**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing**

**– Against J. Clark)**

279.     Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

280.    Spindle and J. Clark were parties to a contract.

281.    J. Clark owed a duty of good faith to Spindle, as every contract in Arizona contains an implied covenant of good faith and fair dealing.

282.    J. Clark breached that duty by performing in a manner that was unfaithful to the purpose of the contract.

283.    As a result of J. Clark's breaches of the implied covenant of good faith and fair dealing, Spindle has sustained damages in an amount to be ascertained at trial.

## THIRTY-FIFTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing

### – Against Tate)

284.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

285.    Spindle and Tate were parties to a contract.

18.    Tate owed a duty of good faith to Spindle, as every contract in Arizona contains an implied covenant of good faith and fair dealing.

286.    Tate breached that duty by performing in a manner that was unfaithful to the purpose of the contract.

287.    As a result of W. Clark's breaches of the implied covenant of good faith and fair dealing, Spindle has sustained damages in an amount to be ascertained at trial.

## THIRTY-SIXTH CLAIM FOR RELIEF

### (Securities Fraud – Against W. Clark)

288.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

289.    W. Clark made an untrue statement of a material fact or omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading in connection with the purchase of securities.

290.    W. Clark acted knowingly.

291.    W. Clark used an instrumentality of interstate commerce in connection with the purchase of securities, regardless of whether the instrumentality was used to make an untrue statement or a material omission.

292.    Spindle justifiably relied on W. Clark's untrue statements of material fact or omissions of material fact.

293.    As a result, W. Clark caused Spindle to sustain damages in an amount to be ascertained at trial.

## THIRTY-SEVENTH CLAIM FOR RELIEF

### (Insider Trading – Against W. Clark)

294.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

295.    W. Clark used an instrumentality of interstate commerce in connection with the purchase of securities.

19.    W. Clark used a device, scheme or artifice to defraud Spindle in connection with the purchase of a security.

296.    W. Clark acted knowingly or with severe recklessness.

297.    Spindle's sale of its restricted common stock was contemporaneous with W. Clark's insider trading.

298.    As a result of W. Clark's insider trading, Spindle sustained damages in an amount to be ascertained at trial.

## THIRTY EIGHTH CLAIM FOR RELIEF

### (Violation of Federal Computer Fraud and Abuse Act

### – Against All Defendants)

299.    Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

300.    Defendants violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or

communication, without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a protected computer.

301.   Defendants violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4) by knowingly, and with intent to defraud Spindle, accessing a protected computer, without authorization or by exceeding authorized access to such a computer, and by means of such conduct furthered the intended fraud and obtained one or more things of value.

302.   Defendants violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(i) by knowingly causing the transmission of a program, information, code, or command and as a result intentionally causing damage without authorization to a protected computer owned by Spindle.

303.   Defendants violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(5)(A)(ii) & (iii) by intentionally accessing a protected computer without authorization, causing damage to Spindle, recklessly or without due regard for their actions.

304.   The computer system or systems that Defendants accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

305.   Spindle suffered damage and loss by reason of these violations, including, without limitation, harm to Spindle's data, programs, and computer systems and other losses and damage in an amount to be proved at trial, but, in any event, in an amount in excess of $75,000 aggregated over a one-year period.

306.   Defendants' unlawful access to and theft from Spindle's computers also have caused Spindle irreparable injury.  Unless restrained and enjoined, Defendants will continue to commit such acts.  Spindle's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Spindle to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

**THIRTY-NINTH CLAIM FOR RELIEF**

**(Aiding and Abetting – Against All Defendants)**

307.   Spindle hereby incorporates by reference and restates paragraphs 1 through 101 as if fully set forth herein.

308.    Defendants had full knowledge, or should have reasonably known, of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such wrongful conduct, including misappropriation of Spindle's trade secrets and confidential information and other unfair business practices, by providing substantial assistance and/or encouraging the others to act.

309.    Defendants also aided and abetted the described wrongful conduct of the other Defendants by giving substantial assistance and/or encouragement that, separately considered, was wrongful in and of itself.

310.    As a direct and proximate result of the aiding and abetting of these acts, Spindle suffered injury, damage, loss, and harm.   The wrongful conduct aided and abetted by the Defendants was a substantial factor in causing this harm.

311.    Defendants' aiding and abetting of these wrongful acts was willful, malicious, oppressive, and in conscious disregard of Spindle's rights, and Spindle is therefore entitled to an award of punitive damages to punish Defendants' wrongful conduct and deter future wrongful conduct.

312.    As result of Defendants' aiding and abetting of these wrongful acts, Spindle sustained damages in an amount to be ascertained at trial.

## PUNITIVE DAMAGES ALLEGATIONS

313.    Defendants have acted willfully and maliciously and with an evil hand guided by an evil mind thereby justifying an award of punitive damages on those claims that permit such an award in an amount sufficient to punish Defendants and to deter others from engaging in similar misconduct.

## JURY DEMAND

314.    Pursuant to Rule 38, Fed. R. Civ. P., Spindle demands a trial by jury on all claims so triable.

**WHEREFORE**, Spindle prays for relief and judgment as follows:

A.      For actual damages sustained by Spindle in an amount in excess of $75,000, in an amount to be more specifically established at trial in accordance with proof;

B.      As a further remedy for Defendants' willful and malicious misappropriation of Spindle's trade secrets, double damages under both the Arizona Uniform Trade Secrets Act and the federal Defend Trade Secrets Act of 2016

B.      For injunctive relief;

C.      For attorney's fees and all litigation-associated expenses pursuant to A.R.S. § 12-341.01(A), A.R.S. § 44-404, 18 U.S.C. § 1836(b)(3) and/or paragraph 8(e) of W. Clark's Employment Agreement with Spindle;

D.      For taxable costs;

E.      For consequential damages;

F.      For punitive damages;

G.      For pre- and post-judgment interest at the maximum rate allowed by law; and

H.      For such other relief as the Court may deem just and proper.

**RESPECTFULLY SUBMITTED** this 2nd day of August, 2016.

<b>DICKINSON WRIGHT PLLC</b>

By: s/ David G. Bray
  David G. Bray
  1850 North Central Avenue, Suite 1400
  Phoenix, Arizona 85004
  *Attorneys for Plaintiff Spindle, Inc.*

DC 71938-1 294727v1